IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


RICHARD PATRICK HORTON                                            PLAINTIFF


           v.                          Civil No. 5:20-cv-05138


SHERIFF SHAWN HOLLOWAY, Benton
County, Arkansas; LIEUTENANT WYATT BANTA;
LIEUTENANT TYLER ROSS; DEPUTY KENNETH
COGDILL; DEPUTY JOSHUA SUMLER; SERGEANT
GREG HOBELMAN; PAROLE OFFICER CRAIG
FOREMAN; CAPTAIN GAGE, Jail Administrator;
CORPORAL TAYLOR; DEPUTY K. KILLMAN; SERGEANT
VOLNER; MATT ETRIS; CORPORAL MONDAY; and
FORMER DEPUTY TEDDY DALTON                                     DEFENDANTS


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a *pro se* civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff, Richard

P. Horton ("Horton"), contends his constitutional rights were violated during his arrest on February

19, 2020, and subsequent incarceration in the Benton County Detention Center ("BCDC").

Specifically, Horton alleges excessive force was used against him during his arrest.  He further

maintains that while incarcerated he was denied due process; was subjected to unconstitutional

conditions of confinement; and was retaliated against when his commissary and/or newspapers

were taken away.

The case is before the Court on the following motions:  (1) the Motion for Summary

Judgment (ECF No. 77) filed by Sheriff Holloway, Lieutenant Banta, Lieutenant Ross, Deputy

Cogdill, Deputy Sumler, Sergeant Hobelman, Captain Gage, Corporal Taylor, Deputy Killman,

1

Sergeant Volner, Corporal Monday, and Former Deputy Teddy Dalton (collectively "the Benton County Defendants"); (2) the Motion for Summary Judgment (ECF No. 78) filed by Matt Etris ("Etris"); (3) the Motion for Summary Judgment (ECF No. 86) filed by Parole Officer Craig Foreman; and (4) the Response and Cross-Motion (ECF No. 90) filed by Horton.   Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making this Report and Recommendation.

## I.    APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *National Bank of Com. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor."   *Nat. Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."   *Id*. (citing*, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.    DISCUSSION

### A.    Excessive Force Claim Against Officer Foreman

### (1).    Summary of the Facts

Officer Foreman is employed by the Arkansas Community Correction as a parole officer. (ECF No. 86-1 at 1).   He was assigned to supervise Horton.   *Id.*   On February 19, 2020, when Horton reported for a visit, his urinalysis was positive for methamphetamine.   *Id.*   Because of the positive test and other parole violations, Horton was arrested.   *Id.*   Horton was handcuffed by Officer Foreman.[1]   *Id.*   After Horton was handcuffed and his vehicle was searched, he was transported to the BCDC for booking.   *Id.* at 2.   Officer Foreman indicates he never heard Horton complain that the handcuffs were bothering him.   *Id.* at 3.

When he arrived at the BCDC, Horton was complaining of shoulder pain and was taken to the Northwest Medical Center emergency room.[2]   (ECF No. 86-3 at 1).   Horton's differential diagnosis was listed as:   "contusion, sprain, fracture, scapula."   (ECF No. 86-3 at 5).   Horton's x-ray was normal.   *Id.*   Horton was advised to use rest, ice, compression, and evaluation ("RICE") and to use his choice of over-the-counter nonsteroidal anti-inflammatory drugs ("NSAIDs").   *Id.*   He was to follow-up with an orthopedic appointment.   *Id.*   Horton gave a history of having a prior rotator cuff injury but denied ever having it examined.   *Id.*

---

[1] At Horton's request a subpoena was issued for the dash cam video from the two Rogers Police Department patrol vehicles that responded to the scene of the arrest.   The videos do not show Officer Foreman handcuffing Horton.

[2] Horton initially asserted a due process and an official capacity claim against Officer Foreman.   These claims were dismissed by Opinion and Order (ECF No. 41) entered on January 25, 2021.

At his deposition, Horton testified that the hospital told him his shoulder was not dislocated and there was nothing wrong with it.   (ECF No. 83-9 at 6).   However, Horton believed his right rotator cuff had been torn again; he testified that this type of injury cannot be diagnosed by an x-ray.   (ECF No. 86-2 at 16).   He had access to Tylenol and ibuprofen but the medications did not relieve his pain and he ceased taking them.   *Id.* at 15-16.   He had no further shoulder treatment. *Id.* at 15.   Horton submitted no medical requests regarding his shoulder while at the BCDC. (ECF No. 83-3 at 23-44).

### (2).   Analysis of the Claim

Different standards apply to excessive force claims brought by pretrial detainees and those brought by convicted individuals.   In this case, Horton was arrested on February 19, 2020, on a parole violation charge and various other criminal charges resulting from items found during the search of his vehicle.   (ECF No. 83-2 at 1-3).   He did not sign his parole violation papers until February 26th.   Both Horton and Officer Foreman agree that Horton was in pretrial status on February 19, 2020.   (ECF No. 88 at 7).

The objective reasonableness standard applies to excessive force claims brought by pretrial detainees.   *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).   "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove."   *Id.* at 394.   A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396.   The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'"   *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."

*Id.*; *see also Ryan v. Armstrong,* 850 F.3d 419, 427 (8th Cir. 2017).   "[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham* 490 U.S. at 396).   An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective.   *Id.* at 398-99.

The nature or quantum of the force must be the focus of the Court's inquiries.   The absence of injury is a factor the Court considers in determining whether excessive force was used.   The Court must also keep in mind that the mere fact that injuries occurred does not support an excessive force claim if they are the result of a "*de minimus* use of force."   *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000).

In the context of the use of handcuffs, the Court of Appeals for the Eighth Circuit has made it clear that a detainee must suffer more than *de minimus* injuries to support an excessive force claim.   *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011).   This is true because the use of handcuffs or other physical restraints frequently results in minor injuries to the inmate.   *Id.*   In *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003), the Eighth Circuit rejected an excessive force claim when, as a result of handcuffing, the only injury shown was some bleeding. *Id.*   It noted there was no evidence of "long term or permanent injury."   In *Foster v. Metro. Airports Comm'n.,* 914 F.2d 1076 (8th Cir. 1990), the Plaintiff maintained he had suffered "nerve damage" in his arms as a result of being in handcuffs.   *Id.* at 1082.   The Eighth Circuit rejected

the claim noting that the Plaintiff presented "no medical records indicating he suffered any long-term injury as a result of the use handcuffs." *Id.* The Court in *Foster* noted that the Plaintiff's "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury," were insufficient to support an excessive force claim. *Id.*

Here, Horton claims he suffered a torn rotator cuff. Although he was seen at the emergency room, no such diagnosis was made. Once he was booked into the BCDC, he sought no treatment for his shoulder. He has sought no treatment for his shoulder since being incarcerated in the Arkansas Division of Correction ("ADC"). Without any medical records supporting Horton's claim or evidence of treatment while incarcerated, the foregoing cases dictate that summary judgment be granted in Officer Foreman's favor.

Officer Foreman additionally contends he is entitled to qualified immunity. The qualified immunity inquiry consists of two questions: "(1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional right; and (2) whether that constitutional right was clearly established as of the time of the relevant conduct such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citation omitted). The Court can answer the questions in either order. *Pearson v. Callahan,* 555 U.S. 223, 242 (2009). A § 1983 plaintiff may defeat qualified immunity only if the answer to both questions is yes. *Boude v. City of Ramore*, 855 F.3d 930, 933 (8th Cir. 2017) (citation omitted). Having found no constitutional violation exists as to Horton's excessive force claim, Officer Foreman is entitled to qualified immunity. *See e.g., Kulkay v. Roy*, 847 F.3d 637, 646 (8th Cir. 2017) (finding individual defendants entitled to qualified immunity when plaintiff failed to state a constitutional violation).

6

### B.  Due Process

### (1).  Summary of the Facts

On February 23, 2020, Deputy Sumler gave Horton a disciplinary for refusal to obey an

order and interference with staff duties.  (ECF No. 83-5 at 1).  Deputy Sumler's incident report

gave the following details:

> At approximately 0610 hours while closing doors in Pod D154 on the top tier,
> Inmate Horton, Richard . . . walked out of his cell, Cell 257, and told me to get out
> of his way.  Not knowing what was going on I stepped out of the way.  Inmate
> Horton walked to Cell 252 which was the pod restroom and spit in the toilet.  I
> went into Cell 252 and asked Inmate Horton what he said to me.  He told me that
> he said to get out of the way.  I told Inmate Horton that he wasn't going to talk to
> me that way.  I told Inmate Horton to go to the door, he stood there and looked at
> me.  I grabbed Inmate Horton's right arm to escort him to pod control.  While
> escorting Inmate Horton down the stairs, I instructed him to give me his left arm
> as well, he stated that since he had something in his left hand he couldn't.  I
> instructed Inmate Horton to drop the items in his left hand and to give me his left
> arm.  Inmate Horton tried to give the items in his hand to another inmate.  At that
> point I grabbed Inmate Horton's left arm and placed his left hand behind his back
> along with his right hand.  I escorted Inmate Horton out to pod control and placed
> him on the wall of pod control.  I talked to Inmate Horton about his disrespectful
> comments, he proceeded to be disrespectful.  I instructed Inmate Horton to have
> a seat in a chair outside of the pod.  I went back into Pod D154 to finish closing
> doors.  When I came back out to pod control, Corporal Taylor had instructed
> Inmate Horton to stand up and face the wall in the hallway.  I placed Inmate
> Horton in handcuffs and escorted him to E-pod.  Inmate Horton was housed in
> E102 Cell 126.  . . . I am locking Inmate Horton down for a B-5 refusal to obey
> an order, and a B-6 interference with facility operations lockdown offenses.
> Inmate Horton had no commissary.

*Id.* at 2.

> Horton described his interaction with Deputy Sumler as follows:
>
> [H]e came and woke me up early that morning.  I had phlegm stuck in my throat.
> When I came out to spit it out, he stood in front of me.  I had him get out of the
> way so I could go spit it out.  I went to the PR or public restroom . . . to spit it out.
> When I came out of the PR—he had followed me all the way over there, and then
> when I came out of there he said, "You don't talk to me that way.  You don't be

7

disrespectful to me."   And I was like, "Look, I was just trying not to spit on you."
[H]e replied: "No.   You get down to the pod control."

I had my towel and everything in my hand.   I was trying to walk down the steps.
He's like, "Put your hands behind your back."   I already had my right hand behind
my back, but I couldn't do it with my left hand.   He knocked the stuff out of my
hand.   We got to pod control. . . . He handcuffed me, locked me up, said that I
refused to obey an order and that I interfered with staff operations.

(ECF No. 83-9 at 7).

The Benton County Defendants submitted as Exhibit A-7 a disk containing seven separate
video files.   The files are without audio.   The file labelled D154 shows the encounter between
Horton and Deputy Sumler.   Horton exits his cell and enters the cell located at the top of the stairs.
Deputy Sumler follows Horton, appears to speak briefly to him, and begins leading him down the
stairs.   Deputy Sumler has control of Horton's right arm and is holding it behind Horton's back.
Horton is holding various items in his left hand.   At the base of the stairs, Horton drops the items
and Deputy Sumler takes control of Horton's left arm and holds it behind Horton's back.   Horton
is escorted from the pod.   The remaining video files follow Horton as he is escorted to a different
pod.

According to Horton, Corporal Taylor, the shift sergeant, was the one who told Deputy
Sumler to lock Horton down.   (ECF No. 83-7 at 8).   Horton believes Corporal Taylor was amused
by the way Deputy Sumler treated him on the stairs.   *Id.*

Horton was given a disciplinary report that contained the date and time of the alleged
violation, Deputy Sumler's name, listed the rules allegedly violated, and contained a listing of the
loss of privileges including commissary, games (cards, dominos, etc.), telephone, and visitation.
(ECF No. 83-5 at 1).   According to Deputy Sumler, it is "common practice to confiscate an

8

inmate's personal property and commissary items as soon as they are placed on lockdown and given back to them when their lockdown is over."  (ECF No. 90 at 11).

Horton maintains he was locked down with all his privileges taken away before any adjudication of guilt.  (ECF No. 83-9 at 7).  He indicates he cancelled his commissary order because it would have been taken away from him.  *Id.*

Horton remained in E-pod until February 26, 2020, when he was released back to general population.  (ECF No. 83-9 at 8).  No hearing was held and the disciplinary was withdrawn.  *Id.*

On May 17, 2020, Former Deputy Teddy Dalton locked Horton down for a rule infraction. (ECF No. 90 at 13).  In accordance with the practice at the time, Deputy Dalton removed Horton's personal property when he was moved to segregation.  *Id.* at 13-14

On June 13, 2020, Horton had another incident with Deputy Sumler.  (ECF No. 83-5 at 5).  This incident occurred during medication pass.  *Id.*  According to Deputy Sumler's incident report:  "After Inmate Horton took his medication, he turned his head to me and barely opened his mouth and started to walk back into the pod.  I instructed Inmate Horton to stop, turn around and face me and show his hands.  Inmate Horton was being disrespectful and argued with me before showing me his hands.  Inmate Horton put up his hands in an aggressive manner."  *Id.* Horton was locked down for refusal to obey an order and interference with facility operations or staff duties.  *Id.*  Horton's commissary items, which included a pillow, socks, underwear (including the underwear he was wearing), towel, wash cloth, bowl, cup, spoon, ear plugs, cards, various hygiene items, and coffee, were taken from him.  (ECF No. 83-5 at 6); (ECF No. 90 at 13-14).

Horton was served with a disciplinary report that once again contained the date, time of the alleged violations, the rules allegedly violated, and a listing of the privileges lost when the inmate is initially moved to segregation including commissary, games (cards, dominos, etc.), telephone, and visitation. (ECF No. 90 at 9 & 12). The form contains no signatures, no hearing date, no statement of evidence relied on for a finding of guilt, no hearing notes, and no sanctions are listed. *Id.* However, the guilty box is marked. *Id.* In addition to the loss of privileges, "[o]nce an inmate is found in violation of facility rules, they [are] subject to having their bedding removed after 5 am. It is then returned to them before 9 pm." *Id.* at 12.

According to Horton, he was found not guilty of these disciplinary charges. (ECF No. 83-10 at 3). Horton remained in segregation until the next day when he tested positive for COVID. *Id.* He was moved to a quarantine pod and heard no more about these charges. *Id.*

According to BCDC policy, "[i]nmates may be placed on administrative segregation for medical, mental, safety, security, or disciplinary reasons." (ECF No. 83-1 at 2). *"[C]onditions of confinement* are basically the same in *an administrative segregation* unit or cell as that of the general population. Unless there are compelling reasons, inmates in administrative segregation are normally afforded the same privileges as other inmates." (ECF No. 83-7 at 8). Inmates are "subject to the same conditions of discipline as other inmates." *Id.*

BCDC policy provides that when an inmate has been found guilty, they will lose privileges. (ECF No. 83-1 at 4-5); (ECF No. 83-7 at 18 (loss of privileges is a sanction for rule infractions)). Following a finding of guilt for a rule violation, an inmate may be put on disciplinary segregation. (ECF No. 83-1 at 2) "[I]nmates in disciplinary segregation are subject to more stringent personal property, reading material limitations, communications such as visitation and telephone privileges,

10

programs, . . . and activities and commissary privileges." *Id.* at 3.   Showers are limited to one every three days.  *Id.*

### (2).  Analysis of the Claim

### (a).  Due Process Standards Applicable to Pretrial Detainees.

The standards applicable to due process claims vary depending on whether the plaintiff's status was that of a pretrial detainee or a convicted prisoner.   Pretrial detainees are presumed innocent and cannot be punished for the crime for which they have been charged.   *Bell v. Wolfish,* 441 U.S. 520, 535-37 (1979).   "[T]he effective management of the detention facility once the individual is confined is a valid objective that may justify the imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment."   *Id.* at 540.   Conditions or restrictions that are "reasonably related to a legitimate governmental objective" such as institutional order and security do not amount to punishment.   *Id.* at 539-40; *see also Brown-El v. Delo,* 969 F.2d 644, 647 (8th Cir. 1992)("We do not quarrel with the prison's need to segregate individual inmates from the general prison population for non-punitive reasons; for example .   .   . where there is a threat to the safety and security of the institution").   If the conditions or restrictions are deemed punishment, the pretrial detainee is entitled to due process.   When a detainee "is deprived of privileges or placed in a special confinement status in order to punish him for past misconduct, then due process requires some kind of hearing beforehand."   *Id.*   In *Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974), the Supreme Court held that pretrial detainees are entitled to an impartial due process hearing on disciplinary matters.   *See also Hartsfield v. Nichols*, 511 F.3d 826, 830 (8th Cir. 2008).   These procedures include written notice of the charges, a brief period to prepare, a written statement of

the evidence relied on and reasons for the disciplinary action, and the ability for the inmate to call witnesses and present documentary evidence.   *Id*.; *see also Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007).

### (b).  Due Process Standards Applicable to Convicted Inmates

In contrast, a convicted inmate must be afforded due process only when the "punitive" isolation amounts to an "atypical and significant" hardship.   *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995).   The Eighth Circuit has "consistently held that administrative and disciplinary segregation are not atypical and significant hardships under *Sandin.*"   *Portly-El v. Brill,* 288 F.3d 1063, 1065 (8th Cir. 2002).   *See also Orr v. Larkins,* 610 F.3d 1032, 1034 (8th Cir. 2010)(inmate was not deprived of liberty interest during nine months of administrative segregation); *Kennedy v. Blankenship,* 100 F.3d 640, 642-43 (8th Cir. 1996)(30 days of punitive confinement, including restrictions on mail, visitation, commissary, and other privileges, is not an atypical and significant deprivation).   Additionally, prisoners do not have a liberty interest in being housed in, or transferred to, any particular prison unit.   *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983).

### (c).  Pretrial Detainee/Parolee Status

The Benton County Defendants contend Horton should be treated as a convicted inmate for all claims because he was convicted, paroled, and then re-incarcerated.   In support, they cite the Court to several Eastern District of Arkansas cases and an unpublished opinion of the Ninth Circuit.   In each of the Eastern District of Arkansas cases, the court held that "[b]ecause '[h]is original conviction is the authority under which he was confined after his parole violation,' he must be treated as a convicted person for purposes of considering his due process claims."   *Dodd v. Lattimore,* No. 4:18-cv-487, 2018 WL 4346686, *1 (E.D. Ark. August 30, 2018)(Plaintiff listed

his status as a parole violator with charges pending)(quoting *Washington v. Byrd*, No. 4:22-cv-00008, 2012 WL 925148, * (E.D. Ark. March 16, 2012).   In the *Washington* case, the plaintiff was arrested on felony charges.   *Id.* at *1.   At the time of his arrest, he was on parole from an earlier state conviction.   *Id.*   The Court noted that different standards applied to the due process claims brought by pretrial detainees and convicted inmates.   *Id.* at *2.   The Court stated that the rights of a pretrial detainee/parolee were more circumscribed than those of a pretrial detainee as he had been found guilty of at least one criminal offense and then was released on parole.   *Id.* at *4.   Ultimately, the Court concluded it need not resolve the due process claim because the defendants were entitled to qualified immunity.   *Id.*

Horton maintains he should be treated as a pretrial detainee for the time period between February 19, 2020, and February 26, 2020, when he signed his revocation papers.   (ECF No. 91 at 2).   While he was on parole, Horton points out he had not been found guilty of the violation of parole charge.   *Id.*

In the absence of clear precedent on this issue, the Court is unwilling to treat a parolee awaiting a hearing on a revocation charge as a convicted inmate.   The parolee may be found not guilty on the violation charge; just as he may be found not guilty of other pending criminal charges. In those circumstances, treating the parolee as a convicted inmate would circumscribe his rights to many constitutional protections that are afforded in greater measure to a pretrial detainee.   Horton will therefore be treated as a pretrial detainee for the time period of February 19th to February 26th.   After that time period, he was in convicted status.

**(d).   February 23, 2020, Incident**

As soon as Deputy Sumler charged Horton with disciplinary violations, Horton was moved to lock-down in administrative segregation and all his privileges were taken away as was his personal property including his underwear and other clothing items.   Horton remained on administrative segregation until February 26th when the disciplinary was dropped.   According to Deputy Sumler, it is "common practice to confiscate an inmate's personal property and commissary items as soon as they are placed on lockdown and given back to them when their lockdown is over."   (ECF No. 90 at 11).[3]   Defendants have not advanced any legitimate safety or security reasons for these deprivations while inmates are awaiting a hearing on disciplinary charges.   In fact, according to the BCDC's own policy, those on administrative segregation retain their privileges.   There is a genuine issue of material fact as to whether the conditions and restrictions of confinement placed on Horton amounted to punishment without due process.

Corporal Taylor was the shift sergeant and was present in pod control when Deputy Sumler took Horton out of the pod.   To establish personal liability of a supervisory defendant, [Horton] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights."   *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)).   Horton has alleged that Corporal Taylor told Deputy Sumler to place Horton on lock-down; was amused by the lock-down; and took no steps to correct Deputy Sumler's actions.   (ECF No. 83-9 at 8).   These allegations are sufficient to create a genuine issue of material fact as to whether Corporal Taylor was personally involved in the constitutional violation.

---

[3] *See also* (ECF No. 90 at 12)("The inventory and removal of commissary occurs when the inmate is moved to segregation.   If an inmate is found not in violation of rules, his/her commissary will be returned.").

14

Moreover, the summary judgment record contains sufficient evidence to allow the official capacity claim against Benton County to proceed.   Horton has alleged the existence of a unofficial custom or practice of subjecting any inmate charged with a disciplinary violation to immediate lock-down and the termination of privileges including the possession of personal property. *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016)(governmental entity subject to liability where the plaintiff was injured by acts taken pursuant to the entity's custom).

### (e).   May 13, 2020, Incident

This incident involved a disciplinary report written by Former Deputy Teddy Dalton. Horton was in convicted status at this time.   The Eighth Circuit has held that confinement to administrative or disciplinary segregation does not constitute an atypical and significant hardship within the meaning of *Sandin*, 515 U.S. at 484.   *See e.g., Smith v. McKinney,* 954 F.3d 1075, 1082 (8th Cir. 2020)("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship")(cleaned up).   Horton had no right to due process with respect to his move to administrative segregation or the attendant deprivation of privileges.

### (f).   June 13, 2020, Incident

This incident involved a disciplinary charge made by Deputy Sumler.   Horton was in convicted status at the time of this disciplinary.   He had no right to due process under these circumstances.

### C.   Unconstitutional Conditions of Confinement

### (1).   Summary of the Facts

During Horton's incarceration in the BCDC, a world-wide pandemic existed.   On January 31, 2020, the Secretary of Health and Human Services determined that a national public health

15

emergency existed as a result of confirmed cases of "2019 Novel Coronavirus."[4]   On March 11, 2020, the World Health Organization declared COVID-19 to be a world-wide pandemic.[5]   On March 11, 2020, Governor Asa Hutchinson, by executive order, declared a state of emergency due to COVID-19.[6]

Horton maintains that the failure of the BCDC's officials to follow the Centers for Disease Control and Prevention ("CDC") and Arkansas Department of Health ("ADH") guidelines regarding quarantining, use of personal protective equipment ("PPE"), and overcrowding resulted in an unsafe environment.   On March 26, 2020, Horton advised medical staff that he had been susceptible to respiratory infections since he had broken his ribs and fractured several vertebrae as a result of a fall from a ladder in 2013.   (ECF No. 83-3 at 1-2).   On April 16th, Horton complained of a runny nose and yellow mucous.   *Id.* at 3.   He was told he could have a cold pack but he declined when he was told he had to pay for it.   *Id.*   He was told only medical visits were free during the pandemic.   *Id.*   On May 27th, Horton complained of chest congestion and stated he was coughing up phlegm.   *Id.* at 4.   He was told he would be seen by a nurse.   *Id.* at 4.

On June 1, 2020, the jail population was 400.   (ECF No. 90 at 10-11).   The BCDC has in excess of 600 inmate beds.   (ECF No. 93 at 7).[7]

On June 7, 2020, Horton submitted a series of grievances complaining about overcrowding and being subjected to health hazards.   (ECF No. 83-3 at 7).   He complained that three inmates were being housed in two-man cells.   *Id.*   He indicated inmates in D150 were complaining of

---

4https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (accessed November 30, 2021).
5https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed November 30, 2021).
6https://governor.arkansas.gov/our-office/executive-orders/P60 (accessed November 30, 2021).
7 The Benton County Defendants' Response to the Horton's counter motion for summary judgment indicates the facility has 669 beds.   However, this statement appears to be unsupported by affidavit or other evidence.   Horton asserts that there were 667 beds.   (ECF No. 91 at 5).   This assertion also appears to be unsupported.

cold like symptoms.  *Id.*  He noted that new inmates were being admitted directly off the streets.
*Id.*  He maintained that his health and safety were being put at risk due to the pandemic and the
BCDC practices.  *Id.*  He stated that he would be informing news media about their refusal to
keep him safe.  *Id.*  He asserted that he "caught something" from one of the inmates he just found
out was quarantined that day, noting multiple inmates were sick in the pod and there was no way
the overcrowded inmates could practice social distancing.  *Id.*

> Lieutenant Ross responded by stating that:
>
> Every inmate that is brought into the facility is checked by medical staff and if they
> have any signs of illness, they are put in quarantine.   If you have anyone in your
> pod that is feeling sick, they need to put in a sick call and be seen by nursing staff.
> We check temps multiple times a day to [e]nsure that anyone that is sick is pulled
> out of general population.

(ECF No. 83-3 at 7).

That same day, Horton submitted a medical request complaining of coughing, a sore throat,
and skin sensitivity.  (ECF No. 83-3 at 8).  He was again told he would be seen by a nurse.  *Id.*

On June 8, 2020, Horton asserted that if the BCDC did not keep new inmates isolated for
forty-eight hours before being put in general population then the jail had "not taken preventative
measures to [e]nsure that any communicable [diseases] from the outside are not spread to the jail
population."  (ECF No. 83-3 at 9).   In Horton's mind, this exhibited a knowing disregard for the
health of the inmate population.  *Id.*   Lieutenant Banta responded:  "We are following all
guidelines for COVID-19.   If you are feeling sick, they you need to put in a request to medical."
*Id.*

On June 12, 2020, Horton submitted a medical request stating he was not getting better;
the congestion in his lungs was worse; he was feeling sick to his stomach; the body aches were

worse; and he was losing his appetite.[8]  (ECF No. 83-3 at 10).   He was told he would be seen by

the nurse.  *Id.*   On June 14th, Horton testified positive for COVID.  *Id.* at 31.   On June 16th,

Horton asked to be able to call his daughter to tell her he had tested positive for COVID.   *Id.* at

11.   He indicated the ADC was providing free phone calls for inmates testing positive and asked

that he be afforded the same opportunity.  *Id.*   Lieutenant Ross responded that the only way to

allow him to make a free phone call was to let him use the pod control phone.  *Id.*   As Horton

was on quarantine, he was told they could not do that.[9]  *Id.*

On June 23, 2020, Horton submitted a medical request stating that his throat was still sore

and he was coughing up phlegm.  (ECF No. 83-3 at 12).   In response, he was told his complaints

were forwarded to the doctor for review and he would be started on Mucinex to help with the

cough and congestion.  *Id.*

On June 28, 2020, Horton complained of shortness of breath and pressure on his throat and

chest.  (ECF No. 83-3 at 12).   He was told to see the nurse at evening medication distribution.

*Id.*   Horton complained of respiratory problems again on July 3rd and was told he had been added

to nurse sick call.  *Id.* at 14.

On July 7, 2020, Horton complained he was experiencing the following symptoms:   a

headache for the past three days; a feeling like his head was not connected to his body; light

headedness and disorientation; losing his sense of taste and smell again; body aches with tremors

---

[8] Horton has not asserted a separate denial of medical care claim.   The Court includes his medical requests only because they are relevant to his claim that he was repeatedly exposed to COVID-19; he suffered symptoms associated with it; and he contracted it.

[9] Lieutenant Ross' response to Horton's request appears to contradict the statement Lieutenant Ross makes in his affidavit that detainees are allowed free phone calls. (ECF No. 83-11 at 4).

and a feeling like his "insides" were "clenching up;" fatigue; and pressure behind the eyes.   (ECF No. 83-3 at 15).   He was told he would be seen by a nurse.   *Id.*

On July 12, 2020, Horton complained that he was having a hard time breathing and it felt like his left lung was not working.   (ECF No. 83-3 at 17).   He noted he had been complaining about the same problem for some time now; that the chest congestion continued; and he was still having tremors and headaches.   *Id.*   He asserted he was not getting the treatment he needed.   *Id.* In response, he was told he would be seen by a nurse.   *Id.*   On July 17th, a chest x-ray was taken and no acute findings were noted.   *Id.* at 44.   On July 19th, Horton indicated he still had the upper respiratory infection and asked if a specimen of the phlegm should not be tested.   *Id.* at 18.   He was told the chest x-ray had been clear with no signs of infection and that the doctor would review his chart.   *Id.*

On July 20, 2020, Horton complained that since they were not allowed to hang their towels on their bed frames and there was no alternative means of hanging them that they had to lay them on their beds.   (ECF No. 83-3 at 18).   He indicated that this practice was unsanitary because of the possibility of mildew or a fungus forming and in light of the inmates having tested positive for COVID-19.   *Id.*   Lieutenant Ross responded that they were getting a shelf for the pod for the inmates to hang towels on.   *Id.* at 19.

By affidavit, Lieutenant Ross outlined the COVID precautions taken at the BCDC.   (ECF No. 83-11).   He indicates upon arrival new inmates are required to complete a medical questionnaire and their temperatures are taken.   *Id.* at 1.   Inmates answering yes to any question are taken to the hospital for evaluation.   *Id.*   If they are cleared by the hospital, they are put in a quarantine pod.   *Id.*   Lieutenant Ross indicates there is insufficient space for the BCDC to

physically quarantine all new inmates for fourteen days. *Id.* at 2. Detainees are encouraged to increase handwashing and cleaning of their living areas and to avoid close contact whenever possible. *Id.* Movement of detainees was limited as was the movement of volunteers, visitors, and/or contactors. *Id.* Cleaning supplies were made available three times daily. *Id.*

Efforts were made to reduce the population by releasing inmates charged with non-violent misdemeanors on citation or bonds when possible. (ECF No. 83-11 at 2). The first COVID positive inmate was identified in early June of 2020. *Id.* As a result, mass testing was performed through the ADH and at least 164 inmates and staff tested positive. *Id.* at 2-3. The majority were asymptomatic or mildly symptomatic. *Id.* at 3. Commissary services were temporarily suspended and the movement of trustees limited. *Id.* Rapid testing was not part of the regular protocol because of supply issues. *Id.* Based on ADH recommendations, all positive inmates were housed together and all those who tested negative were housed together. *Id.* Inmates testing negative were retested to account for possible exposure after initial testing. *Id.* A second mass testing occurred in September 2020. (ECF No. 90 at 6). There were 255 inmates and staff who tested positive.[10] *Id.*

Visitation was limited to video visitation. (ECF No. 83-11 at 4). No physical or face-to-face visits between attorneys and inmates were allowed. *Id.* Detainees were allowed "free phone calls, legal mail and the ability to contact attorneys through Smart Jail Mail for free." *Id.* Inmates were allowed to correspond with families or by written or electronic correspondence. *Id.* at 3-4. Video appearance at court proceedings was used in all cases where it was possible. *Id.*

---

[10] In their response to Horton's counter motion for summary judgment, the Benton County Defendants maintain that the results of the second mass testing were that 50 detainees and 5 staff tested positive. (ECF No. 93 at 8). However, this statement is not supported by affidavit nor is any exhibit referenced. Lieutenant Ross's affidavit did not address the second testing.

Inmates are provided face coverings;[11] staff wear face coverings at all times;[12] temperatures are checked twice daily and anyone having a temperature of 100.4 or higher is checked by medical staff. *Id.*

### (2). Analysis of the Claim

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough;" in the context of an incarcerated individual, it "renders him unable to care for himself." *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.,* 489 U.S. 189, 199-200 (1989)(citations omitted).

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993). The Cruel and Unusual Punishment Clause of the Eighth Amendment[13] places substantive limits on state action and forbids prison conditions that involve the "unnecessary and wanton infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)(citations omitted).

"It is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions.'" *Frazier v. Kelley,* 460 F. Supp. 3d 799, 834 (E.D. Ark. 2020)(quoting *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982)). Prison officials are required to provide adequate food, clothing, shelter, and reasonable safety. *DeShaney,* 489 U.S. at 200; *see also Butler v. Fletcher,* 465 F.3d

---

[11] Lieutenant Ross attaches to his affidavit a news article in which Sheriff Holloway is quoted as saying he was working on getting face coverings for inmates and that donations would be accepted. (ECF No. 83-12 at 2).
[12] In responding to interrogatories, Deputy Killman indicates he had entered pods without PPE. (ECF No. 90 at 17). He indicated that at morning meetings they were told if PPE was required or only suggested on that day. *Id.*
[13] As Horton was a convicted inmate for the majority of his incarceration at the BCDC, the Court will apply the Eighth Amendment standard to his conditions of confinement claim.

340, 345 (8th Cir. 2006).   The Eighth Amendment protections extend to the exposure of inmates, to conditions that "pose an unreasonable risk of serious danger to . . . future health."   *Helling,* 509 U.S. at 35.

The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society."   *Estelle v. Gamble,* 429 U.S. 97, 102 (1976).   As is the case with all Eighth Amendment claims, a prisoner must suffer some greater than *de minimis* actual injury in order to receive compensation.   *Irving v. Dormire,* 519 F.3d 441, 448 (8th Cir. 2008).

To establish an Eighth Amendment violation, Horton must prove both an objective and subjective element.   *Revels v. Vincenz,* 382 F.3d 870, 875 (8th Cir. 2004)(citation omitted).   "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.   The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner."   *Id.*   Even if prison officials actually knew of a substantial risk to inmate health or safety, the officials are not liable "if they responded reasonably to the risk, even if the harm ultimately was not averted."   *Farmer,* 511 U.S. at 844.   "[D]eliberate indifference entails something more than negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."   *Id.,* at 835.

As noted above, Horton's concerns are related to the COVID-19 pandemic.   He maintains that BCDC's failure to quarantine incoming inmates; the overcrowded conditions; the failure to test inmates more frequently; the inability to maintain social distancing; the failure of inmates and jail personnel to wear masks; the large number of COVID cases; his susceptibility to respiratory

22

infections and other medical conditions; and the overall unsanitary conditions place him at extraordinary risk of suffering a debilitating injury and possible death. The Court believes that the objective component of Horton's Eighth Amendment claim is satisfied by the existence of a highly contagious virus coupled with Horton's limited ability to take proactive measures due to his incarceration. *Wilson v. Williams,* 961 F.3d 829, 840 (6th Cir. 2020)(Objective prong met where"[t]he COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure or death" which is exacerbated by the close quarters of a prison).

Ordinarily, the subjective component must be addressed separately with respect to each defendant. However, on this claim, Horton has sued the Defendants in their official capacity only. (ECF No. 6 at 8);(ECF No. 83-9 at 10). An official capacity claim is considered a claim against the employing governmental entity; in this instance, Benton County. *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012). A governmental entity may not be held liable for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability. *Monell v. New York Dep't. of Soc. Servs.,* 436 U.S. 658, 694 (1978). "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep., Mo.,* 829 F.3d 695, 699 (8th Cir. 2016)(citations omitted). Horton has pointed to no unconstitutional policy. He does not contend that there was a deliberately indifferent failure to train or supervise the offending actors. Thus, to prevail, Horton must show there was an unofficial custom that violated of his Eighth Amendment rights. *Monell,* 436 U.S. at 694.

In *Corwin*, the Eighth Circuit stated that:

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin*, 829 F.3d at 700 (citation and internal quotation marks omitted).

"The Court is keenly aware of the significant health risks associated with COVID-19 and the ease with which this disease is transmitted, especially in a prison setting." *Tate v. Arkansas Dept. of Corr.,* No. 4:20-cv-0558, 2020 WL 7378805, *8 (E.D. Ark. Nov. 9, 2020). It has been said that "[p]risons are petri dishes for contagious respiratory illnesses." *United States v. Emanuel,* 20-cr-0048, 2020 WL 1660121, *4 (S.D.N.Y. March 31, 2020)(cleaned up)(finding the jail had not met the most basic recommendations of the CDC to prevent the spread of the virus). "Public health experts agree that incarcerated individuals are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe, infection control is challenging in these settings." *Id.* at *5 (cleaned up). The population in county jails is transient, funds are limited, and general health conditions tend to be worse than at Federal Bureau of Prisons facilities. *Id.* at *4.

"As judges, our conscribed role is not to assess whether [Benton County] could have done more to contain the virus—no doubt they could have. Our limited role is thus to determine whether [Benton County] has made the requisite showing that its efforts to combat COVID-19 satisfied the constitutionally required minimum." *Valentine v. Collier,* 978 F.3d 154, 158 (5th Cir. 2020). While Horton faults Benton County for failing to comply strictly with the guidelines

24

of the CDC,[14] the failure to enact these guidelines does not equate to the violation of the Eighth Amendment. *Id.* at 164 ("The Eighth Amendment does not enact the CDC guidelines"). Moreover, "[w]hat we know about COVID-19 and the spread of the novel coronavirus is constantly changing, as new information is released by medical researchers, agencies, and other authorities." *Kesling v. Tewalt,* 476 F. Supp. 3d 1077, 1087 (D. Idaho 2020).

In this case, the undisputed summary judgment record establishes that Benton County responded to the COVID-19 pandemic by putting in place measures designed to control the spread of COVID-19 in the detention center. These measures included the implementation of temperatures checks; health questionnaires; limiting visitation, court appearances, and access of third party contractors to the building; limiting, to the extent possible, movement within the jail; early release of inmates; providing face masks to inmates as well as mandating that staff wear face masks; quarantining inmates who tested positive; the increased provision of cleaning supplies; limiting commissary for a period of time; and testing--including the mass testing of inmates by the ADH on at least two occasions during Horton's incarceration. Horton maintains all incoming inmates should have been quarantined for 14-days; inmates should have been tested more frequently; inmates susceptible to infection because of pre-existing medical conditions, such as himself, should have been treated more carefully; and three men should not have been placed in cells designed for two men. However, "[t]he prison is a finite space. It would be impossible to isolate every inmate who is *potentially* infected—the prison does not have enough space to house each such inmate in a single cell." *Kesling,* 476 F. Supp. 3d at 1088 (emphasis in original).

---

[14] Centers for Disease Control, *Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed November 30, 2021).

No genuine issue of material fact exists as to whether Benton County had an unconstitutional custom of exhibiting deliberate indifference to the significant risk of harm posed by COVID-19. It did not. Benton County's response to the pandemic, at least on the facts contained in the summary judgment record, was reasonable.

### D.  Retaliation

### (1).  Summary of the Facts

After he contacted news media, Horton maintains his commissary access was first limited and then discontinued for a period of time. (ECF No. 78-2 at 5-6). Sometime in June of 2020, Horton indicates commissary was limited to what was referred to as a "goodie bag." *Id.* The goodie bag "pretty much just [contained] junk food. Inmates were allowed to purchase these twice." *Id.* According to Horton, inmates were not allowed to purchase any soap, toothpaste, toothbrushes, or shampoo. *Id.* Instead, if an inmate had money in his account he paid for, or if he was indigent, once a week he received a "little bottle of this all-in-one liquid that's supposed to be soap, shampoo, shaving gel or whatever." *Id.* at 7. Horton maintains that despite the fact that "170 plus inmates" had tested positive for COVID, they were not allowed to have their own antibacterial soap. *Id.*

After a period of time, there was no commissary at all. (ECF No. 78-2 at 6). A posting on the kiosk said: "Per command staff, commissary privileges will be suspended until further notice." (ECF No. 78-3 at 5). Horton was not sure of the date and time this notice was put on the kiosk. *Id.* Lieutenants Banta and Ross told Horton this was Keefe policy. (ECF No. 78-2 at 6). Later, on some unspecified date, [15] a kiosk message indicated that: "Effective

---

[15] Horton maintains he was not provided with copies of these postings and cannot recall the dates. (ECF No. 78-3 at 5 & 7). Nothing in the summary judgment record indicates when these postings were made or who made the postings.

immediately, commissary privileges will be reinstated.   All commissary orders need to be placed on the kiosk on Friday."   (ECF No. 78-3 at 7).   Horton does not know who this notice.

     At all times relevant to this case, Matt Etris was the Operations Supervisor for Keefe Group.   (ECF No. 78-1 at 1).   In this position he "assisted in operating the commissary" at the BCDC.   *Id.*   Etris maintains that "[n]either Keefe Group, nor myself, had the authority to unilaterally shut down commissary."   *Id.* at 2.   During June and July of 2020, Etris was "given orders by facility staff not [to] run orders for any quarantine pods (areas where inmates were being quarantined due to COVID-19) unless told otherwise by command staff."   *Id.*   He was not allowed to enter a pod without a deputy escort.   *Id.*   "Both jail staff and myself would have been risking exposure to COVID-19 during the commissary delivery process."   *Id.*   Etris recalled two times "during this period when COVID-19 cases were increasing at the jail, so command staff asked me to shut down commissary until they could separate the positive and negative inmates as the test results came in."   *Id.*

     According to Defendants' answers to interrogatories, during the months of June-August 2020, "due to the presence of COVID-19 in the facility outside contractors did not come into the facility. Keefe had no employees that could enter."   (ECF No. 90 at 11).   Defendants indicate they are unsure of the exact duration of the suspension but that commissary employees could not enter the pod in compliance with health guidelines.   *Id.* at 18-19.

     On June 18, 2020, Horton complained that they did not receive the whole newspaper—sections B, C, and D were missing and each contained news.   (ECF No. 83-3 at 11).   He asserted there was "no reason or justification for withholding that news from us."   *Id.*   Horton stated they

knew there were articles in the newspaper regarding the BCDC and COVID-19.  *Id.*  Lieutenant Banta responded that it would be looked into.  *Id.*

On July 8, 2020, Horton wrote that he knew their commissary had been taken away for a month in "retaliation for grievances and contacting the media about the way that [you are] treating us here."  (ECF No. 83-3 at 15).  According to Internet research, Horton stated that the BCDC was the only jail in Arkansas not allowing inmates to receive commissary.  *Id.*  He asserted that the jail "took our privileges without due process or just cause and that is a blatant violation of our constitutional rights."  Lieutenant Banta responded:  "Commissary pass has been suspended until further notice due" to the policy of the commissary company.  *Id.*  Horton then asked for the Keefe company policy number.  *Id.* at 16.  He noted that the ADC also had a contract with Keefe and commissary items were being distributed there despite the pandemic.  *Id.*  Horton further noted that the message on the kiosk had stated commissary was suspended pursuant to command staff.  *Id.*  Lieutenant Ross told Horton to request the policy from Keefe.  *Id.*

On July 20, 2020, Horton complained there was no newspaper.  (ECF No. 83-3 at 18).  Lieutenant Ross responded that they should have a newspaper.  *Id.*

On August 9, 2020, Horton reported that the B section of the newspaper which contained the local news had been removed.  (ECF No. 83-3 at 21).  He noted this was the second time the same shift had removed the B section of the newspaper.  *Id.*  Lieutenant Ross responded that they only removed ads and the classifieds from the newspaper.  *Id.*  Horton responded he had been told by Sergeant Monday via Deputy Allen that the sections had been removed and thrown in the trash before they arrived at work.  *Id.*  Horton remarked that this only happened on the weekends

when none of the command staff were there to look into it.  *Id.*  Lieutenant Ross responded that

it would be looked into.  *Id.*

According to Horton, Sergeant Volner was the night shift booking sergeant when the

trustees removed sections of the newspaper before delivering them to the inmate population.

(ECF No. 83-9 at 14).    Horton indicated that Sergeant Hobelman had advised him that the third

shift booking staff were responsible for the delivery of the newspaper.  *Id.* at 15.    Horton has no

direct evidence that Sergeant Volner ordered the local news section to be removed.  *Id.*  With

respect to Corporal Monday, Horton testified he was informed by other BCDC personnel that

Corporal Monday was responsible for the removal of the paper.  *Id.*  With respect to Sergeant

Hobelman, Horton testified he was the one who said no newspapers were delivered the one day.

*Id.*  Horton states this was a falsehood because he observed there were newspapers in the facility.

*Id.*  On another occasion, Horton testified that Sergeant Hobelman said there were sections of the

paper that did not get delivered.  *Id.*  Horton believes Captain Gage is responsible as he is part of

the command staff.  *Id.* at 15-16.    Horton believed Captain Gage should have been aware that the

newspapers were not delivered.  *Id.* at 16.

### (2).  Analysis of the Claim

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his

status as a prisoner or with the legitimate penological objectives of the correction system."  *Pell*

*v. Procunier,* 417 U.S. 817, 822 (1974).  Prisoners' correspondence with members of the news

media is a protected First Amendment activity.  *Id.* at 824 ("[I]t is clear that the medium of written

correspondence affords inmates an open and substantially unimpeded channel for communication

with persons outside the prison, including representatives of the news media"); *Nolan v.*

*Fitzpatrick,* 451 F.2d 545, 547-48 (1st Cir. 1971)(prisoners "retain the right to send letters to the press concerning prison matters").   Similarly, restrictions on the right to read newspapers have only been approved in limited circumstances.   *See e.g., Beard v. Banks,* 548 U.S. 521, 534 (2006)(restrictions, including all access to newspapers, were reasonable when applied only to those with the most serious prison-behavior problems).

Here, Horton does not deny he had access to the media.   In fact, he testified that he kept in regular contact with a reporter about the conditions of confinement in the jail from June until September 2020.   (ECF No. 83-9 at 13-14).   In retaliation for corresponding with a reporter, Horton contends he was denied access to the newspaper on one occasion and on two other occasions he was denied access to the local news section of the newspaper.   Horton believes the days he was denied access to the newspaper was because articles regarding the conditions and/or COVID-19 outbreaks at the BCDC were contained in the newspapers on those dates.   *Id.* at 14. Horton also  contends the inmates' access to commissary was curtailed in retaliation for them notifying the media about the conditions in the jail.   *Id.*

"[A]ctions taken in retaliation for an inmate's [exercise of his First Amendment rights] are actionable under 42 U.S.C. § 1983."   *Nelson*, 603 F.3d at 450; *Madewell v. Roberts,* 909 F.2d 1203, 1206 (8th Cir. 1990)(otherwise proper acts are actionable under § 1983 if taken in retaliation for exercise of a constitutionally protected act).    To establish a retaliation claim, Horton must prove "(1) he engaged in a protected activity, (2) [one or more of the Defendants] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quotation omitted).   Determining

whether a person of ordinary firmness would be chilled involves "an objective test: [t]he question is not whether the plaintiff [him]self was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

Horton's retaliation claim is supported by only speculation and conjecture. While there is some proximity in the timing of the incidents, "more than a temporal connection is required to present a genuine factual issue on retaliation." *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006). "To properly state a claim for First Amendment retaliation, [Horton] is required to show "a causal connection between a defendant's retaliatory animus and [his] subsequent injury.'" *Clark v. Clark*, 926 F.3d 972, 980 (8th Cir. 2019)(quoting *Osborne v. Grussing*, 477 F.3d 1002, 1005 (8th Cir. 2007)). Here, there is simply no causal connection between the incidents. With respect to the newspaper, Horton identified only three occasions on which the newspaper was completely or partially withheld. (ECF No. 83-9 at 14 (submitted grievances about each incident)); (ECF No. 83-3 at 11 (on June 18, 2020, no sections B, C, or D)); (ECF No. 83-3 at 18 (on July 20, 2020, no newspaper)); (ECF No. 83-3 at 21 (on August 9, 2020, no section B)). Regarding access to commissary, the restrictions placed on commissary were done as a precaution and/or response to the spread of COVID-19 within the facility. (ECF No. 83-11 at 3-4); (ECF No. 83-12 at1)(first inmate testified positive in June--mass testing done and 164 inmates tested positive); (ECF No. 90 at 6); (ECF No. 93 at 8)(second outbreak occurred in September of 2020—mass testing done).[16] The restrictions were temporary and Horton's testimony indicates

---

[16] In Horton's statement of undisputed facts which is sworn to under penalty of perjury, he asserts that 255 inmates testified positive in September. (ECF No. 90 at 6). In the Benton County Defendants' response, they dispute this and indicate only 50 detainees tested positive. (ECF No. 93 at 8). However, the statement is not made under penalty of perjury, no exhibit is referenced, and no affidavit provided to support this statement.

the commissary restrictions were lifted despite his continued correspondence with a reporter. (ECF No. 83-9 at 13-14 correspondence with reporter continued until September 2020); (ECF No. 83-9 at 21-22 & 24 limited commissary for approximately a month and then commissary suspended for approximately a month beginning about the end of June).   Horton concedes restrictions were also placed on in-person visitation and other activities involving third parties, including contractors, entering the facility.   *Id.* at 24.   These restrictions occurred right after the first outbreak of COVID-19 at the facility.   *Id.* at 25.   There are no genuine issues of material fact on Horton's retaliation claim, and Defendants are entitled to summary judgment.

### III.   CONCLUSION

For these reasons, it is recommended that:

1.   The Motion for Summary Judgment (ECF No. 86) filed by Officer Foreman be **GRANTED** and the claims against him be **DISMISSED WITH PREJUDICE.**

2.   The Motion for Summary Judgment (ECF No. 77) filed by the Benton County Defendants be **GRANTED** as to the due process claims stemming from incidents occurring on June 13, 2020, and May 13, 2020, and the conditions of confinement claims.   These claims should be **DISMISSED WITH PREJUDICE.**   This dismisses all claims against Lieutenant Banta, Lieutenant Ross, Deputy Cogdill, Sergeant Hobleman, Captain Gage, Deputy Killman, Corporal Monday, Sergeant Volner, and Former Deputy Dalton.

3.   The Motion for Summary Judgment (ECF No. 77) filed by the Benton County Defendants be **DENIED** as to the due process claim stemming from the February 23, 2020, disciplinary issued by Deputy Sumler.   This claim remains for trial

against Deputy Sumler, Corporal Taylor, and Sheriff Holloway.

4.  The Motion for Summary Judgment (ECF No. 78) filed by Matt Etris be

    **GRANTED** and the claims against him be **DISMISSED WITH PREJUDICE.**

5.  The Cross-motion for Summary Judgment (ECF No. 90) filed by Horton be

    **DENIED.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of December 2021.


*/s/ Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

33